Application of Helle OUTTRUP et al.

Patent Appeal No. 76–507.

United States Court of Customs and Patent Appeals.

April 1, 1976.

Joseph F. Nakamura, Washington, D.C., for the Commissioner of Patents; Jack E. Armore, Washington, D.C., of counsel.

Morris Fidelman, Fidelman, Wolffe & Leitner, Washington, D.C., atty. of record, for appellants.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Associate Judges.

RICH, Judge.

This appeal is from the decision of the Patent and Trademark Office (PTO) Board of Appeals affirming the final rejection under 35 U.S.C. § 103 of claims 1–3, 11, and 13, the remaining claims in appellants' application serial No. 40,725, filed May 26, 1970, entitled "Preparation of Microbial Enzymes." We affirm.

*The Invention*

Appellants claim to have discovered that certain strains of the bacterium *Bacillus licheniformis* (BL), when suitably cultured, produce an alpha-amylase [1] which has excellent heat stability, is suitable for use in cleaning agents at high pH values, e. g., 9, and is stable in the presence of high concentrations of $Ca^{++}$-sequestering agents. Appellants assert that their alpha-amylase is

1. "Alpha-amylase" is the general term denoting a class of enzymes which partially digest starch. Alpha-amylases vary in composition and properties depending on the source, as appellants' specification implies. See also 8 *Kirk-Othmer Encyclopedia of Chemical Technology* 192–93 (2d ed. 1965). Appellants' alpha-amylase is used in enzyme laundry and dishwashing detergents, inter alia.

unexpectedly superior to the prior art alpha-amylase produced by *Bacillus subtilis*. The claims on appeal read:

1. A process for the production of an enzyme product containing an alpha-amylase having a good activity and stability at high pH values, at low concentrations of $Ca^{++}$ and at high temperature, which comprises cultivating *Bacillus licheniformis* in a suitable nutrient medium for a period in excess of about 1 day until a high level of alpha-amylase activity has been induced in the fermentation broth, whereafter a high alpha-amylase content enzyme product is isolated from the fermentation broth.

2. A process as claimed in claim 1, wherein a strain of *Bacillus licheniformis* NCIB 8061 is used.

3. A process as claimed in claim 1, wherein a strain of *Bacillus licheniformis* selected from the group consisting of NCIB 8059, ATCC 6634, ATCC 6598, ATCC 11945, ATCC 8480 and ATCC 9945a is used.

11. The alpha-amylase obtained by cultivating a culture of *Bacillus licheniformis* for in excess of about one day and thereafter isolated from the fermentation broth.

13. A process for hydrolyzing starch which comprises treating starch in solution with the alpha-amylase obtained by cultivating a culture of *Bacillus lichenformis* [sic] for in excess of about one day and thereafter isolated from the fermentation broth.

### The Prior Art

Keay et al. (Keay) 3,592,737 July 13, 1971
    (application filed Aug. 14, 1968)
Roald et al. (Roald) 3,451,935 June 24, 1969
Bernlohr, *Postlogarithmic Phase Metabolism of Sporulating Microorganisms*, 239 J.Biol.Chem. 538 (1964).

Keay discloses a method for separating amylase and protease and recovering each fraction from an enzyme solution produced by the culturing, preferably, of a mutated strain of *B. subtilis*. Keay employs organic solvents to precipitate the amylase present, stating:

> After precipitating proteinaceous impurities using the soluble calcium salt, which is employed at a moderately high level, any amylase present may be precipitated either after removing the precipitate or without prior removal of the precipitate, as desired, by addition of a sufficient amount of an organic solvent which is water-miscible and in which the amylase is itself not soluble.

Roald is essentially cumulative to Keay and need not be separately discussed.

The Bernlohr article is primarily concerned with the production of protease by culturing the A–5 strain of BL. The portion of the article particularly relied upon below states:

> Routinely, culture supernatant solutions containing at least 50 units per ml of enzyme were concentrated about 100-fold by lyophilization before preparative work was performed. Attempts to purify the protease activity by conventional methods yielded poor results, apparently because most of the extracellular protein had similar physical characteristics, even after dialysis at 0°. *Several other enzyme activities, including alpha anylase, were recovered in the same fraction as the protease* after ammonium sulfate or cold ethanol fractionation.[1]

The protease was purified several fold, however, simply by dialyzing the concentrated enzyme solution against distilled water at 37°. Thirty milliliters of solution were dialyzed against 1 liter of water, and the water was changed each hour. The protein content and the activity of the enzyme were monitored, and it was found that after 7 hours, the protease had hydrolyzed the other proteins and then had begun autolysis. At this point, the enzyme solution was lyophilized and stored at –20°. Fig. 2 diagrams the time course of this dialysis procedure. The total activity of the protease remains fairly constant until the 6th hour of dialysis and then decreases. During this time, the protein concentration drops pre-

cipitously, resulting in an increase in the specific activity of the protease. At the 7th hour of dialysis, the enzyme is freeze-dried and stored. [Emphasis ours.]

Footnote 1 reads: "Unpublished experiments." Bernlohr's Fig. 1 is a graph showing the increase in protease activity in the supernatant solution over the 24-hour culturing period he employs. The graph shows that protease activity increased approximately 55 units/ml of supernatant solution between hour 11 and hour 12, but only about 40 units/ml over the 12-hour period up to hour 24, or about 3½ units/hr.

### The Rejection

The examiner's final rejection states:

Claims 1 to 3 and 11 to 13 are rejected under 35 USC 103 as unpatentable over Bernlohr (1964) taken with Keay et al and Roald et al, all of record. Bernlohr teaches that *Bacillus licheniformis* (the same strain employed in applicant's [sic] Example 6) produces alpha-amylase as well as protease which were recovered in the same fraction. (Page 539). Keay et al and Roald et al each teach that amylases (carbohydrases and diastase) are often produced in addition to proteases when the latter is produced by culturing microorganisms including Bacilli to produce enzymes. Keay et al further teaches the separation of amylase from protease when it is the desired objective. Furthermore it is not apparent that the claims require the separation of protease from alpha amylase. Applicants' examples reveal the presence of substantial proteolytic activity with amylase-containing culture fluid. Applicants' arguments have been carefully considered. However they are not pursuasive [sic] that the claimed subject matter is unobvious over the prior art. Figure 1 of the 1964 Bernlohr reference indicates an increase in

enzyme (protease) activity as culture time increases. There is no suggestion in this reference that enzyme activity after 24 hours will decrease. As a matter of fact it would be obvious from Figure 1 that enzyme activity would continue to increase after 24 hours cultivation. The fact that Bernlohr had difficulty separating the enzymes would not disuade [sic] one skilled in the art from isolationg [sic] alpha amylase from the fermentation broth, particularly in view of Keay et al (subsequent to Bernlohr) who recognize the problem and difficulties related to the fractionation of amylase and protease and provide a solution to this problem.

The board adopted this reasoning, commenting that appellants appeared to have admitted in their specification that the method of claim 13 was old in the art. The board also held that two declarations by appellant Aunstrup, which the examiner entered after the final rejection, did not overcome the rejection. These declarations will be discussed in detail infra.

### OPINION

Appellants attack the rejection on the ground that Bernlohr does not disclose the production of alpha-amylase by culturing BL in a manner sufficient to put alpha-amylase from this source "in the hands of the public." For that reason, argue appellants, persons of ordinary skill in the art would not have been motivated by the Bernlohr disclosure to use BL as a source of alpha-amylase that may be fractionated by the Keay process.[2] Appellants refer to both the Bernlohr disclosure itself and to the Aunstrup declarations to support their position.

Appellants' legal theory is based on *In re Coker,* 463 F.2d 1344, 59 CCPA 1185 (1972); *In re Sheppard,* 339 F.2d 238, 52 CCPA 859 (1964); and *In re Brown,* 329 F.2d 1006, 51

2. In contrast to most cases involving 35 U.S.C. § 103, appellants do not argue that the Aunstrup declarations overcome the PTO's finding of *prima facie* obviousness through a showing of unexpected advantageous results or the like. Cf. *In re Freeman,* 474 F.2d 1318, 1322–24, (CCPA 1973). Rather, appellants argue that

the declarations and references viewed together show that persons of ordinary skill in the art would not have looked to the culturing of BL as a source of alpha-amylase *of any kind,* much less the allegedly superior alpha-amylase appellants say is produced by BL strains.

CCPA 1254 (1964). *Coker* and *Sheppard* stand for the principle that a reference does not "describe" an invention within 35 U.S.C. § 102, and thus is not an anticipation of the invention, unless that single reference contains sufficient disclosure to put the invention in the hands of the public. Reasoning from this, and from *Brown*, appellants attempt to show that Bernlohr does not enable persons of ordinary skill in the art to produce usable quantities, more than a "smear" as appellants term it, of alpha-amylase by culturing BL and that accordingly it would not have been obvious to do so since Bernlohr is the only reference before us which discloses alpha-amylase from BL. See also *In re Hoeksema*, 399 F.2d 269, 55 CCPA 1493 (1968).

■ The evidence does not support appellants' position. Although, as appellants argue, Bernlohr is primarily interested in protease from BL, which he purifies by destroying the other enzymes produced by his A–5 strain, Bernlohr clearly suggests that BL does produce alpha-amylase, albeit without describing the yield. Keay, however, eliminates these shortcomings of Bernlohr by providing persons of ordinary skill in the art with means of recovering "any amylase present" in a mixed enzyme solution, thus implying that even very small yields of alpha-amylase are capable of recovery and practical use. Keay specifically states, "The exact activity of the mixture of enzymes employed as starting material depends on the method of preparation and is not critical to the present invention providing only that the starting solution has the desired proteolytic or amylolytic activity." Since Bernlohr does disclose the production of alpha-amylase by the culturing of BL, appellants have the burden, which they have attempted to shoulder with the Aunstrup declarations, of showing that Bernlohr's BL strain A–5 does not produce sufficient alpha-amylase to merit the attention of those of ordinary skill in the art as a source of the enzyme. It is apparent from Roald and Keay that persons of ordinary skill in this art are constantly endeavoring to find new sources for enzymes and are thus motivated to find and use sources of alpha-amylase other than *B. subtilis* and similar prior art bacterial sources.

Aunstrup "Declaration–1" purports to show that alpha-amylase from a particular BL strain (NCIB 8061) is superior to alpha-amylase from *B. subtilis*. Aunstrup "Declaration–2" compares the alpha-amylase yields of several BL strains for the purpose of supporting his conclusion that

■n his opinion the microgram quantity yields of alpha-amylase from Strain A–5 and most other *B. licheniformis* strains would either be unnotised [sic] by workers in the art due to insensitive measurement of [sic] techniques, or if notised [sic] be considered indicative of an unimportant non-recoverable broth liquor constituent.

Part of Table IB in Declaration–2 is as follows:

| Example | Strain | Amylase NU/ml[3] | Activity Pure Enzyme Microgram/ml |
|---|---|---|---|
| 1 | NCIB 8061 | 300 | 30 |
| 3 | ATCC 6634 | 30 | 3 |
| 6 | Bernlohr A–5 | 30 | 3 |

The culturing time is nowhere indicated in the declaration. Aunstrup gave his opinion that most BL strains are low producers of alpha-amylase and that they would be considered primarily protease producers by those in the art.

■ We find that all of this evidence, considered afresh with Bernlohr and Keay, *In re Rinehart*, 531 F.2d 1048, (CCPA 1976), does not suffice to show unobviousness. It is, at best, inconclusive. *The claims do not prescribe a level of enzyme activity*. The claimed culturing time, namely, "in excess of about 1 day," has not been shown by the declarations to produce any unexpected increase in enzyme activity or any other advantageous property over the approximate-

---

3. "NU" usually signifies "Northrop Unit." One NU is the amount of enzyme that produces 40% hydrolysis of the substrate in 60 minutes at pH8 and at 40°C. 8 *Kirk-Othmer, supra,* at

223. The NU, according to this reference work, which Keay cites as prior art, is used to indicate protease activity. Appellants do not state what their "NU" means.

ly 24-hour culturing period employed by Bernlohr,[4] inasmuch as Declaration–2 fails to indicate how long the various strains were cultured to produce the reported yields. The reported yields themselves are similarly inconclusive, because the yields of alpha-amylase of prior art BL strain A–5 (which strain is within the scope of claims 1, 11, and 13) and strain ATCC 6634 (within the scope of claim 3) are the *same*. From appellants' specification it appears that strain NCIB 8061 was previously known to appellants (and to others). They do not claim to have discovered the strain itself but only a use for the strain. The difference in yield between strain A–5 and strain NCIB 8061 is not alleged to be unexpectedly great. Further, Aunstrup's opinion that the yields given in Table IB, supra, would be considered undetectable or inconsequential is not persuasive of error in the PTO's rejection of the claims. Such yields *are* detectable, since Bernlohr did detect alpha-amylase from BL strain A–5. Whether they are inconsequential or not is not sufficient to show that they cannot be recovered in high alpha-amylase content products using Keay's process, since Keay teaches that the enzyme activity level of the starting material is not critical if the starting solution has the type of amylolytic activity desired. Declaration–1 does not tip the scales in appellants' favor because it compares the alpha-amylase produced by only one BL strain, NCIB 8061, and not other known (and claimed) BL strains, with only one prior art alpha-amylase (which may not be representative) and fails to show that the NCIB 8061 alpha-amylase is unexpectedly superior. See *In re Freeman,* supra, and cases cited therein. The rejection of claims 1–3 is *affirmed.*

There is likewise no error in the rejection of claims 11 and 13. Bernlohr discloses alpha-amylase from BL. The process limitation of claim 11 to culture time of "in excess of about one day" has not been shown to distinguish, in composition, this alpha-amylase from Bernlohr's. We agree with the board that claim 13 defines an obvious use of appellants' amylase, which is itself fully disclosed in the prior art. The use of alpha-amylase to digest starch is also disclosed by Keay. The rejection of claims 11 and 13 is *affirmed.*

*AFFIRMED.*

4. Bernlohr's Fig. 1, referred to supra, does suggest on its face that some increase in enzyme activity may be expected when culturing is extended beyond the 24-hour period shown. This conclusion is reinforced by Bernlohr's statement that "the elaboration of the protease by [BL] appears to be the function of a postlog phase metabolism," i. e., enzymes are liberated into the broth *after* rapid growth of BL has ceased.